DA 11-0458

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2012 MT 191

RAUL C. SANCHEZ,

      Petitioner and Appellant,

    v.

STATE OF MONTANA,

      Respondent and Appellee.

APPEAL FROM:    District Court of the Twentieth Judicial District,
In and For the County of Sanders, Cause No. DV 09-22
Honorable C.B. McNeill, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Colin M. Stephens, (argued); Smith & Stephens, P.C.; Missoula, Montana

      For Appellee:

          Steve Bullock, Montana Attorney General; C. Mark Fowler (argued),
Assistant Attorney General; Helena, Montana

          Robert Zimmerman, Sanders County Attorney; Thompson Falls, Montana

          Argued:  April 30, 2012
      Submitted:  May 1, 2012
        Decided:  September 4, 2012

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Appellant Raul Sanchez (Sanchez) appeals from an order of the Twentieth Judicial District Court, Sanders County, denying his amended petition for postconviction relief. We affirm.

¶2 The sole issue on appeal is whether the District Court erred by denying Sanchez's postconviction petition.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Sanchez was convicted of the deliberate homicide of his ex-girlfriend, Aleasha Chenowith (Aleasha). The events surrounding Aleasha's death and Sanchez's trial and conviction are detailed in our prior opinion, *State v. Sanchez*, 2008 MT 27, 341 Mont. 240, 177 P.3d 444. We recount those facts pertinent to this appeal.

¶4 On July 19, 2004, Sanchez shot and killed Aleasha outside her home. Later that evening, Sanchez turned himself in and admitted to shooting Aleasha. The State charged Sanchez with deliberate homicide. Before trial commenced in June 2005, Sanchez moved to exclude a note, written by Aleasha, which the State proposed as a trial exhibit. The note read:

> To whom it concerns:
> On July 8, 04 around 10:30 p [sic] Raul Sanchez Cardines told me if I ever was cought [sic] with another man while I was dating him, that he would kill me. Raul told me he had friends in Mexico that had medicine that would kill me and our doctors wouldn't know what it was till it was to [sic] late and I would be dead.
> So if I unexspetly [sic] become sick and on the edge of death, and perhaps I die no [sic] you will have some answers.
> Aleasha Chenowith (written and printed signature)

2

*Sanchez*, ¶ 8. Sanchez argued the note should be excluded because it constituted multiple hearsay evidence and violated his Sixth Amendment right to confrontation. The District Court denied Sanchez's motion and ruled that Aleasha's note and the statements within the note were admissible under hearsay exceptions. The court did not address Sanchez's Confrontation Clause argument. *Sanchez*, ¶ 9.

¶5    Sanchez testified at trial and presented a defense based on the existence of mitigating circumstances for the killing. *Sanchez*, ¶¶ 52, 60. Although the jury was instructed on mitigated deliberate homicide, Sanchez was convicted of deliberate homicide and sentenced to life without parole. *Sanchez*, ¶¶ 13-14. Sanchez appealed, and various Appellate Defenders were assigned to represent him. One Appellate Defender was David Avery (Avery), who filed Sanchez's reply brief and presented oral argument to this Court. Then-Chief Appellate Defender James Wheelis (Wheelis) maintained oversight of Sanchez's case after Avery's departure from the Office of the State Public Defender.

¶6    On appeal, this Court affirmed Sanchez's conviction in an opinion dated January 31, 2008. *Sanchez*, ¶ 1. We concluded that, while Aleasha's note constituted hearsay not subject to any exceptions, the note's admission was harmless error because the State presented other admissible evidence that proved the same facts. *Sanchez*, ¶¶ 27-29. Regarding Sanchez's Sixth Amendment confrontation right, we held that Aleasha's note was testimonial hearsay subject to the Confrontation Clause. *See Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004); *Davis v. Washington*, 547 U.S. 813,

3

126 S. Ct. 2266 (2006); *State v. Mizenko*, 2006 MT 11, 330 Mont. 299, 127 P.3d 458. Generally, the Confrontation Clause prohibits introduction of testimonial hearsay evidence against a defendant in a criminal trial unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. *See Crawford*, 541 U.S. at 68, 124 S. Ct. at 1374. However, this Court noted a "forfeiture by wrongdoing" exception to the Confrontation Clause. *Sanchez*, ¶ 39 (quoting *Davis*, 547 U.S. at 833, 126 S. Ct. at 2280 ("'one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation'")). Because we had not considered the forfeiture doctrine since *Crawford* was decided, we discussed how the doctrine had been applied in several cases, including *U.S. v. Garcia-Meza*, 403 F.3d 364 (6th Cir. 2005) and *California v. Giles*, 152 P.3d 433 (Cal. 2007), *vacated, Giles v. California*, 554 U.S. 353, 128 S. Ct. 2678 (2008). *Sanchez*, ¶¶ 40-44. We noted that *Davis'* application of the forfeiture doctrine had generally been interpreted by courts to require a defendant's intent to silence a witness by wrongdoing prior to application of the doctrine, *e.g. Colorado v. Moreno*, 160 P.3d 242 (Colo. 2007), placing doubt on *Garcia-Meza*'s reasoning that the doctrine was *not* limited to situations where the defendant committed wrongdoing with the intent to prevent the witness from testifying. *Sanchez*, ¶¶ 41-43. However, we indicated that other jurisdictions concurred with *Garcia-Meza*'s holding that, in homicide cases, the doctrine's applicability does not depend on the defendant's specific intent to silence a witness. *Sanchez*, ¶ 43. We discussed the California Supreme Court's holding

4

in *Giles* that, in a murder case, an "'intent-to-silence'" requirement was not a prerequisite to the application of the doctrine. *Sanchez*, ¶ 43 (citing *Giles*, 152 P.3d at 443).

¶7 We ultimately held that "[t]o the extent that a deliberate criminal act results in the victim's death, we agree that the forfeiture by wrongdoing doctrine does not hinge on whether the defendant specifically intended to silence a witness," and reiterated that our holding was narrow—the forfeiture doctrine applied "when a defendant admittedly and deliberately kills another person, thus procuring the person's unavailability as a witness." *Sanchez*, ¶¶ 46-47. We concluded that Sanchez had forfeited his Sixth Amendment right to confront Aleasha when he killed her. *Sanchez*, ¶ 47. We "agree[d] with the *Giles* court that a defendant whose intentional criminal act results in a victim-declarant's death benefits from the defendant's wrongdoing if the defendant can use the death to exclude the victim-declarant's otherwise admissible testimony, regardless of whether the defendant specifically intended to silence the victim-declarant." *Sanchez*, ¶ 46 (citing *Giles*, 152 P.3d at 443). However, we stated we did "not adopt *Giles*," and that our holding was qualified. *Sanchez*, ¶ 47 n. 3. We noted the U.S. Supreme Court had granted certiorari for that case on January 11, 2008. *Sanchez*, ¶ 43.

¶8 Sanchez did not file a petition for rehearing and did not, through the Office of the Appellate Defender, file a petition for writ of certiorari in the U.S. Supreme Court. The District Court found that Sanchez's opportunity to file a petition with the U.S. Supreme Court expired on April 30, 2008, 90 days after judgment was entered in this Court. *See* U.S. S. Ct. R. 13(1).

5

¶9     The U.S. Supreme Court decided *Giles* on June 25, 2008 and held that the forfeiture by wrongdoing exception to a defendant's Sixth Amendment confrontation right "applie[s] only when the defendant engaged in conduct *designed* to prevent the witness from testifying." *Giles*, 554 U.S. at 359, 128 S. Ct. at 2683 (emphasis in original). The Court vacated the judgment of the California Supreme Court and remanded for further proceedings. *Giles*, 554 U.S. at 377, 128 S. Ct. at 2693.

¶10    In July 2009, Sanchez filed an amended petition for postconviction relief, alleging ineffective assistance of appellate counsel (IAAC) against Wheelis for failing to file a petition for writ of certiorari to the U.S. Supreme Court on his behalf.[1] After a hearing in which Wheelis and Avery testified, the District Court denied Sanchez's petition. The court first ruled that *Giles* was a new constitutional rule that did not apply retroactively to Sanchez because his conviction "became final long before" *Giles* was decided by the U.S. Supreme Court. Regarding his IAAC claim against Wheelis, the court ruled that Sanchez failed to state a claim for relief because there is no federal, and likely no state, right to counsel for discretionary appeals. Even if Sanchez had established a right to counsel, the District Court determined that Wheelis' performance was not deficient, and Sanchez was not prejudiced. Finally, notwithstanding the prior determinations, the court

---

[1] Sanchez raised other claims in his original petition for postconviction relief, including ineffective assistance of trial counsel for failing to object to Aleasha's statements to a neighbor and her sister on grounds they violated his confrontational right, and ineffective assistance of appellate counsel for failing to challenge trial counsel as ineffective. The District Court denied all of these claims, and Sanchez has not challenged these rulings on appeal.

6

concluded that the introduction of the note was harmless because there was substantial other evidence proving Sanchez was guilty of deliberate homicide.

¶11 Sanchez asks this Court to reverse the District Court's order denying his postconviction petition, or remand the case for a hearing to determine if Sanchez acted with intent to silence Aleasha.

## STANDARD OF REVIEW

¶12 "We review a district court's denial of a petition for postconviction relief to determine whether the court's findings of fact are clearly erroneous and whether its conclusions of law are correct." *Heddings v. State*, 2011 MT 228, ¶ 12, 362 Mont. 90, 265 P.3d 600 (citations omitted). Ineffective assistance of counsel claims are mixed questions of law and fact, which are reviewed de novo. *Miller v. State*, 2012 MT 131, ¶ 9, 365 Mont. 264, 280 P.3d 272 (citing *Whitlow v. State*, 2008 MT 140, ¶ 9, 343 Mont. 90, 183 P.3d 861).

## DISCUSSION

¶13 *Did the District Court err by denying Sanchez's postconviction petition?*

¶14 Sanchez argues that the District Court erred when it denied his claim challenging Wheelis' failure to file a petition for certiorari with the U.S. Supreme Court. He contends that Wheelis' failure involves two Sixth Amendment violations: a violation of his right to confrontation under *Giles*, and a violation of his right to effective assistance of counsel.

7

¶15 The State argues that the District Court properly concluded, relying on *Ponce v. Felker*, 606 F.3d 596 (9th Cir. 2010), that *Giles* established a new rule which does not apply retroactively to cases that became final before it was decided. The State notes that Sanchez does not challenge the District Court's determination that his conviction became final long before the *Giles* decision was issued, *see Gratzer v. Mahoney*, 2006 MT 282, ¶ 10, 334 Mont. 297, 150 P.3d 343, and therefore *Giles* is not applicable to Sanchez's Confrontation Clause claim. The State also argues that Sanchez's IAAC claim fails because he had no constitutional right to counsel for purposes of a petition for certiorari, and he cannot establish deficient performance or prejudice under the *Strickland* standard for ineffective assistance of counsel claims.

¶16 We need not address the merits of Sanchez's Confrontation Clause claim. In his reply brief, Sanchez "concedes *Giles* is not retroactive" and instead frames his Confrontation Clause argument in the context of his IAAC claim. He states: "It is precisely because *Giles* is not retroactive that Sanchez asserts a claim of ineffective assistance of appellate counsel. Were *Giles* retroactive, there would be no need to argue appellate counsel was ineffective. . . . Thus, the issue is not whether *Giles* is retroactive; the issue is whether Sanchez's *Sixth Amendment* right to effective assistance of counsel was violated when Mr. Wheelis failed to file a petition for certiorari." (Emphases in original.) Therefore, we move to Sanchez's ineffective assistance of counsel argument.[2]

---

[2] The State argues that Sanchez's Confrontation Clause argument is also barred by res judicata and the law of the case doctrine, but because we are not addressing the Confrontation Clause issue, we do not take up these arguments.

8

¶17 Sanchez concedes that there is no federal constitutional right to counsel on discretionary appeals. *See Coleman v. Thompson*, 501 U.S. 722, 752, 111 S. Ct. 2546, 2566 (1991) (citations omitted) ("There is no constitutional right to an attorney in state post-conviction proceedings."); *Pennsylvania v. Finley*, 481 U.S. 551, 555, 107 S. Ct. 1990, 1993 (1987) (citations omitted) ("We have never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their convictions, . . . and we decline to so hold today. Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further. Thus, we have rejected suggestions that we establish a right to counsel on discretionary appeals."). Thus, Sanchez offers that, while he may not be "entitled to counsel," he is "certainly entitled to effective counsel once counsel has undertaken the task to represent" him.

¶18 Federal law is not supportive of Sanchez's argument. Because there is no constitutional right to an attorney in state postconviction proceedings, "a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings. See *Wainwright v. Torna*, 455 U.S. 586, [102 S. Ct. 1300] (1982) (where there is no constitutional right to counsel there can be no deprivation of effective assistance)." *Coleman*, 501 U.S. at 752, 111 S. Ct. at 2566.[3] Rule 10 of the United States Supreme Court Rules provides, "[r]eview on a writ of certiorari is not a matter of right, but of

---

[3] *Martinez v. Ryan*, __ U.S. ___, 132 S. Ct. 1309 (2012) recently "qualifie[d] *Coleman* by recognizing a narrow exception: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default [where a federal court will not review the merits of claims that a state court declined to hear because the prisoner failed to abide by a state procedural rule] of a claim of ineffective assistance at trial." *Martinez*, 132 S. Ct. at 1315-16. However, the issue presented here does not pertain to whether Sanchez's claims were procedurally defaulted and, therefore, *Martinez* is not controlling.

9

judicial discretion." U.S. S. Ct. R. 10. Consequently, Sanchez has no federal constitutional right to have his case heard by the Supreme Court via a petition for certiorari, and he cannot claim ineffective assistance for that failure. *See Wainwright*, 455 U.S. at 587-88, 102 S. Ct. at 1301 (footnotes omitted) ("In *Ross v. Moffitt*, 417 U.S. 600, [94 S. Ct. 2437] (1974), this Court held that a criminal defendant does not have a constitutional right to counsel to pursue discretionary state appeals or applications for review in this Court. . . . Since respondent had no constitutional right to counsel, he could not be deprived of the effective assistance of counsel by his retained counsel's failure to file the application timely.").

¶19 This Court has not specifically stated whether there is a state constitutional right to counsel on discretionary proceedings, with an attendant duty of effective assistance of counsel, under state law. However, we need not take up that question. As discussed below, because Sanchez cannot prevail on his IAAC claim, we need not decide this constitutional question. *See Kulstad v. Maniaci*, 2010 MT 248, ¶ 49, 358 Mont. 230, 244 P.3d 722 (quoting *Wolfe v. State, Dept. of Labor & Ind.*, 255 Mont. 336, 339, 843 P.2d 338, 340 (1992)) ("'Courts should avoid constitutional questions whenever possible.'"); *State v. Peters*, 2011 MT 274, ¶ 33, 362 Mont. 389, 264 P.3d 1124.

¶20 This Court reviews ineffective assistance of appellate counsel claims like those of trial counsel. *Rogers v. State*, 2011 MT 105, ¶ 37, 360 Mont. 334, 253 P.3d 889. We analyze ineffective assistance of counsel claims by using the two-part test in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). *Miller*, ¶ 13 (citing *Whitlow*, ¶ 10).

10

"Under this test, the defendant must demonstrate (1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the defendant." *St. Germain v. State*, 2012 MT 86, ¶ 8, 364 Mont. 494, 276 P.3d 886 (citation omitted). A defendant must satisfy both prongs of the test, and if an insufficient showing is made on one prong, we do not need to address the other prong. *Baca v. State*, 2008 MT 371, ¶ 16, 346 Mont. 474, 197 P.3d 948 (citing *Whitlow*, ¶ 11).

¶21 We can dispose of Sanchez's argument on the prejudice prong, although Sanchez's arguments are overlapping and his deficiency prong argument would necessarily fail as well. Sanchez argues he suffered prejudice by the loss of certiorari being granted in his case and the opportunity of having this Court's prior opinion vacated and his case remanded for further proceedings. To satisfy the prejudice prong, Sanchez acknowledges that "[he] must demonstrate that there is a reasonable probability that the United States Supreme Court would have granted his cert. petition." We conclude that Sanchez cannot demonstrate prejudice because he has not shown there is a reasonable probability that the U.S. Supreme Court would have granted certiorari in his case.

¶22 Under the prejudice prong of the *Strickland* test, we focus on whether counsel's deficient performance causes an unreliable trial result or creates fundamentally unfair proceedings. *St. Germain*, ¶ 11. "To establish prejudice, the defendant must show that, but for counsel's errors, a reasonable probability exists that the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings." *St. Germain*, ¶ 11 (internal

11

citation omitted). "In the context of a claim against appellate counsel, we have stated the standard as 'whether there is a reasonable probability that, but for counsel's unprofessional errors, the petitioner would have prevailed on appeal.'" *Miller*, ¶ 13 (quoting *DuBray v. State*, 2008 MT 121, ¶ 31, 342 Mont. 520, 182 P.3d 753).

¶23 Because of the very slim odds that the U.S. Supreme Court would have granted Sanchez's petition, Sanchez has not demonstrated there is a reasonable probability that but for Wheelis' error, the result of the proceedings would have been different. *See Pena v. U.S.*, 2005 U.S. Dist. LEXIS 9308 at * 40 (S.D.N.Y. May 18, 2005), *aff'd*, 529 F.3d 129 (2d Cir. 2008) ("Given the extremely low odds that a certiorari petition would have been granted, Pena has not shown a reasonable probability that but for counsel's alleged error, the result of the proceedings would have been different. Pena's ineffective assistance of appellate counsel claim is denied."). In 2008, there were 7,738 cases filed in the United States Supreme Court, 83 of which were disposed of in 74 signed opinions. Thus, roughly 1% of cases were granted. In 2009, 8,159 cases were filed, of which 77 were disposed of in 73 signed opinions—0.9% were granted. In 2010, 7,857 cases were filed, of which 83 were decided in 75 signed opinions. Again, about 1% of cases were granted.[4] *See also U.S. v. Mikell*, 2010 U.S. Dist. LEXIS 2256 at ** 7, 16 (E.D. Mich. Jan. 12, 2010), *cert. denied*, 130 S. Ct. 2078 (2010) ("Fundamentally, grants of certiorari petitions are rare," and "[t]he statistical chance of the Supreme Court granting certiorari

---

[4] These statistics are from the 2009, 2010, and 2011 Year-End Reports on the Federal Judiciary, authored by Chief Justice John Roberts. Supreme Court of the United States, *Chief Justice's Year-End Reports on the Federal Judiciary*, http://www.supremecourt.gov/publicinfo/year-end/year-endreports.aspx (accessed Aug. 27, 2012).

is slim and, even if granted, there is little likelihood that five Justices would vote to reverse or for a new trial based upon the issues presented"). Beyond statistics, the U.S. Supreme Court has also made clear that its review "is discretionary and depends on numerous factors other than the perceived correctness of the judgment we are asked to review." *Ross*, 417 U.S. at 616-17, 94 S. Ct. at 2447. *See also* Margaret Meriwether Cordray & Richard Cordray, *Strategy in Supreme Court Case Selection: The Relationship Between Certiorari and the Merits*, 69 Ohio St. L.J. 1, 2 (2008) ("[T]he Justices' decisions on certiorari are based on a complex and multidimensional set of considerations that also include administrative, rule-based, and jurisprudential factors. While there is little doubt that a broad array of factors plays a role in the case selection process, it remains unclear how great their role is in relation to the impact of merits-oriented factors.").

¶24     Sanchez acknowledges that an overwhelming majority of certiorari petitions to the U.S. Supreme Court are denied, referencing the 1% of cases where certiorari is actually granted, but argues that his petition "almost certainly would have been granted through a process known informally as GVR—grant, vacate, and remand. . . . [T]hese types of proceedings are known as a 'summary disposition without opinion.'" As support for this statement, he refers to Avery's testimony at the hearing that Avery had obtained several summary dispositions in the U.S. Supreme Court and that a summary disposition "would have been what I think would have happened." Sanchez also notes occasions where the

U.S. Supreme Court issued summary dispositions in cases that were legally similar to cases the Court had decided earlier.

¶25 A petitioner for postconviction relief must prove by a preponderance of evidence that he is entitled to such relief. *Rogers*, ¶ 15 (citation omitted). A petitioner bears a heavy burden in seeking to reverse a district court's denial of postconviction relief based on ineffective assistance of counsel claims. *Whitlow*, ¶ 21 (citations omitted). Here, Sanchez cannot meet this heavy burden. First, the District Court determined that Avery's testimony lacked credibility, concluding: "Mr. Avery's opinions do not stand as evidence of what the United States Supreme Court would have done. The documentary evidence of summary reversal Sanchez presented at the hearing no more proves what the United States Supreme Court would have done than Mr. Avery's bare, unsupported opinions. Significantly, contrary to his own professed certitude, Mr. Avery allowed summary disposition by the United States Supreme Court would have been that Court's option." (Citations omitted.) "The district court determines the credibility of the witnesses and the weight assigned to their respective testimony." *In re Parenting of N.S.*, 2011 MT 98, ¶ 25, 360 Mont. 288, 253 P.3d 863 (citations omitted). Further, Sanchez can cite to no governing authority for his assertions about summary reversal, offering only that "it cannot be doubted that the practice of summary reversal is prevalent at the High Court" and that "there is little doubt that reversal (summary or otherwise) was the inevitable result" if Wheelis had not failed to file the petition. He cites to a website indicating that there have been seven summary reversals this term. Even if true, it still does not

14

demonstrate by a preponderance of evidence that he would have obtained relief and thus suffered actual prejudice. *See Strickland*, 466 U.S. at 693, 104 S. Ct. at 2067 (emphases added) ("[A]ctual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant *affirmatively prove prejudice. . . .* Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they *actually had an adverse effect* on the defense.").

¶26 Even if we were to assume, *arguendo*, that Sanchez had carried his burden to prove Wheelis was ineffective, the District Court's determination that the note's introduction was harmless has substantial support. The District Court found that the contested note was "wholly unnecessary to support [the State's] burden at trial of proving beyond a reasonable doubt that [Sanchez] had committed the offense of Deliberate Homicide. Overwhelming other evidence at trial included that on the morning of the homicide, [Sanchez] took his children to a couple's home who had cared for them to assure their safety, followed by [Sanchez] going to a sporting goods store in Plains where he purchased ammunition for the handgun he had brought with him, that he loaded the weapon and then drove to the victim's house where [Sanchez] shot and killed her in the presence of witnesses." Sanchez argues in a conclusory fashion that the note "significantly boosted the State's case that there were not mitigating circumstances" and "severely undercut Sanchez's attempt to present an argument that there were mitigating circumstances present at the time he actually killed" Aleasha. However, "'[a] petitioner claiming ineffective assistance of counsel must ground his or her proof on facts within

15

the record and not on conclusory allegations.'" *Baca*, ¶ 16 (citation omitted). The record facts here do not support Sanchez's broad allegations. Indeed, we have previously concluded that the admission of Aleasha's note was harmless because "no reasonable possibility exists that the statement in the note contributed to Sanchez's conviction." *Sanchez*, ¶ 29 (noting the cumulative evidence of Sanchez's testimony of the day he killed Aleasha, as well as Sanchez's statement to a coworker about getting out his gun and shooting Aleasha). Given the nature of this case and other evidence of Sanchez's guilt, we cannot conclude that the note's admission had an impact on the outcome.

¶27 Affirmed.

/S/ JIM RICE

We concur:

/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ BRIAN MORRIS

/S/JOHN C. BROWN
District Court Judge John C. Brown,
sitting in place of Chief Justice Mike McGrath

Justice Patricia O. Cotter dissents.

¶28 I dissent from the Court's Opinion. I would conclude that the District Court erred in denying Sanchez's petition for postconviction relief.

16

¶29 I agree with the Court's conclusion at ¶ 16 that the issue before us is whether Sanchez's right to effective assistance of counsel was violated when Wheelis failed to file a petition for certiorari. Unlike the Court, I would answer this question in the affirmative.

¶30 The Court accurately observes that there is no federal constitutional right to counsel on discretionary appeals (Opinion, ¶ 17), nor has this Court declared the existence of such a right. In my judgment, there is no need to declare a constitutional right to counsel for collateral proceedings in order to resolve the specific case before us.

¶31 It strikes me as both circular and unnecessary to explore whether Sanchez had the *right* to counsel for purposes of seeking certiorari, as a predicate to consideration of his IAAC claims. The fact is Sanchez did have counsel. As the District Court found in its order denying postconviction relief, Wheelis determined after our 2008 Opinion in *Sanchez* was issued that a petition for certiorari should be filed. He testified that the operating rules of the Office of the Appellate Defender specifically permitted the filing of certiorari petitions at the discretion of the Appellate Defender. The court further found that while Wheelis might normally have required a client to pursue such a petition pro se, he concluded that given Sanchez's inability to speak or understand English, it would be "very improper" to allow Sanchez to proceed without counsel. Wheelis therefore elected to pursue a petition for certiorari on behalf of Sanchez. Thus, whether or not Sanchez had the *right* to counsel, the fact is he did have counsel.

¶32 As the Court notes, the United States Supreme Court has stated that in matters in which there is no constitutional right to counsel, counsel's failure to timely pursue discretionary appeals or petitions does not violate a defendant's right to effective assistance of counsel. Opinion, ¶ 18. Respectfully, I would not adopt this reasoning in Montana. It is one thing to determine that a defendant has no right to have counsel appointed for a discretionary appeal; it is quite another to

17

conclude that where a defendant actually *has* counsel, that attorney is not obligated to provide effective assistance.

¶33 The Montana Rules of Professional Conduct (MRPC) obligate all Montana lawyers to be competent, prompt and diligent in all professional functions. Preamble, (5). Rule 1.1 requires that lawyers provide competent representation to a client. Rule 1.3 requires an attorney to act with reasonable diligence and promptness in representing a client. We have held that where a lawyer undertakes to represent a client, he or she violates the duty owed to the client by failing to diligently proceed on the client's behalf. For example, in *In re Halprin*, 244 Mont. 363, 365-66, 798 P.2d 80, 81-82 (1990), in addition to other violations, we found that attorney Halprin violated MRPC 1.3 when he "failed to act with reasonable diligence and promptness in representing his client" by allowing the statute of limitations to run on his client's wrongful death action, justifying sanctions. A lawyer has a duty to perform competently and diligently in *all* matters. It is simply wrong to implement a rule in criminal matters that competent representation is required of an attorney in cases in which there is a right to counsel, but is not required of counsel in matters in which there is no such right. I would conclude that because Wheelis committed to pursue a petition for certiorari on behalf of Sanchez, he was obligated to provide Sanchez with effective assistance.

¶34 I turn next to the *Strickland* analysis. As the Court notes at ¶ 20, we review ineffective assistance of appellate counsel claims under *Strickland*. Sanchez has acknowledged that he must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced him. Sanchez has satisfied both prongs.

¶35 First, was Wheelis' performance deficient? He conceded that it was, calling his failure to file a petition an error attributable to mistake, forgetfulness, or distraction. He testified at the

18

postconviction hearing that a certiorari petition in the *Sanchez* case "would have been a slam dunk, as close as you can get to that anyway." He also testified that he was reasonably certain that his failure to file a petition would not be considered harmless. While we have held that, in determining whether counsel's conduct was reasonable, "self-proclaimed inadequacies on the part of trial counsel in aid of a client on appeal do not hold great persuasive value with this Court" (*State v. Trull*, 2006 MT 119, ¶ 22, 332 Mont. 233, 136 P.3d 551), we have never held that missing a critical deadline in the handling of a case due to distraction is reasonable. There is simply no question that such a mistake constitutes deficient performance. Perhaps this is why the Court declined to address this prong of the *Strickland* analysis. Opinion, ¶ 21.

¶36 This takes us to the second prong of *Strickland*, which is whether counsel's deficient performance prejudiced the defendant. The Court concludes the prejudice prong cannot be met, stating "[b]ecause of the very slim odds that the U.S. Supreme Court would have granted Sanchez's petition, Sanchez has not demonstrated there is a reasonable probability that but for Wheelis' error, the result of the proceedings would have been different." Opinion, ¶ 23. In support of this statement, the Court cites statistics gleaned from the 2009-2011 Year-End Reports on the Federal Judiciary. Respectfully, these statistics do not shed any light on whether certiorari would have likely been granted in this case. However, three decisions made by the United States Supreme Court subsequent to its ruling in *Giles* do suggest what the outcome of a certiorari petition on behalf of Sanchez would have been.

¶37 Since *Giles* was decided on June 25, 2008, the Supreme Court has on at least three occasions vacated the convictions of persons whose cases turned on the application of "forfeiture by wrongdoing" exception to the Confrontation Clause, as set forth by the California Supreme Court in *Giles*. Two days after the Supreme Court overruled California's *Giles* decision, it

19

granted certiorari to Darrell Younger, vacated the judgment against him, and remanded the case to the Court of Appeal of California. *Younger v. California*, 554 U.S. 931, 128 S. Ct. 2994 (June 27, 2008). This same "grant, vacate and remand" procedure (GVR) was also utilized in the case of *Banos v. California*, 555 U.S. 801, 129 S. Ct. 163 (October 6, 2008), and in *Moua Her v. Minnesota*, 555 U.S. 1092, 129 S. Ct. 929 (January 12, 2009). In all three of these cases—as in our 2008 Opinion in *Sanchez*—the reviewing courts relied on the California *Giles* decision in upholding the convictions before them; in fact, the Minnesota Supreme Court in *Moua Her* relied on both *Giles* **and** our 2008 Opinion in *Sanchez* in reaching its decision. In light of this fact, the odds that the Supreme Court would have granted Sanchez's petition are anything but "slim." There is clearly a reasonable probability that but for Wheelis' error, Sanchez's petition would have been granted and his conviction reversed. As we stated in ¶ 11 of *St. Germain*, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings."

¶38 I next address the Court's contention at ¶ 26 of the Opinion that even if Sanchez had demonstrated that Wheelis was ineffective, the introduction of the handwritten note was harmless error. I submit the Court's analysis in this regard is wrong for two reasons. First, the Court employs an "overwhelming evidence" analysis in reaching its conclusion. ("Overwhelming other evidence at trial included that on the morning of the homicide," Sanchez took certain steps in preparation for his crime.) In *State v. Van Kirk,* 2001 MT 184, 306 Mont. 215, 32 P.3d 735, we rejected the use of the "overwhelming evidence" test in answering the question of whether an error is harmless. *Van Kirk,* ¶ 43.

¶39 In *Van Kirk,* we ruled that once a convicted person has established that the evidence in question was erroneously admitted and alleges prejudice, it becomes incumbent upon the State to

20

demonstrate that the error at issue was not prejudicial. *Van Kirk*, ¶ 42. We went on to reject the "overwhelming evidence" test, and held that we would instead apply the "cumulative evidence" test in answering the prejudice inquiry. We stated: "This test looks not to the quantitative effect of other admissible evidence, but rather to whether the fact-finder was presented with admissible evidence that proved *the same facts as the tainted evidence proved.*" *Van Kirk*, ¶ 43 (emphasis in original). We further said that "the State must also demonstrate that the *quality* of the tainted evidence was such that there was no reasonable possibility that it might have contributed to the defendant's conviction." *Van Kirk*, ¶ 44 (emphasis in original).

¶40 No other evidence properly admitted at trial proved the same facts as the note written by Aleasha. In *Sanchez*, we concluded that the testimony of Aleasha's sister to the effect that Sanchez threatened that if Aleasha made him "mad," his friend from Mexico could supply "stuff" that "would eat her stomach in a matter of days," was not hearsay and was properly admitted. *Sanchez*, ¶ 19. However, we concluded the court erred in admitting the testimony of Aleasha's neighbor Pamela Ehrlich. Ehrlich testified that Aleasha told her that Sanchez said during an argument: "[m]e love you, Aleasha. Me not love you that much. You cross me, I kill you." We determined that the statement was inadmissible hearsay, but ruled that the admission of the statement was harmless. *Sanchez,* ¶ 22.

¶41 In addition to the foregoing evidence, Sanchez's co-worker Sheehan testified without objection that on his lunch break the day of Aleasha's death, Sanchez told Sheehan he had just learned that day Aleasha was cheating on him and maybe he would shoot her. *Sanchez*, ¶ 24. Sanchez himself also testified, admitting that he shot Aleasha but claiming that when he argued with Aleasha on the day of her death and she threatened to have his children taken away from him, "something got dark in [his] head" and he shot her. *Sanchez*, ¶ 10.

21

¶42     While admitting to homicide, Sanchez argued at trial that the homicide was committed under the influence of "extreme mental or emotional stress for which there is reasonable explanation or excuse"; thus, he argued, the jury should convict him of mitigated deliberate homicide rather than deliberate homicide. *Sanchez*, ¶¶ 52, 60. This defense is key to my contention that the admission of the note was not harmless error.

¶43     The date and contents of the note distinguish it from all the other evidence. First, the note was the only evidence that specifically tied Sanchez's threat to kill Aleasha to her dating another man behind his back. Aleasha's sister's testimony did not make this connection. While Sheehan's testimony did connect the threat to infidelity, Sheehan's conversation with Sanchez occurred on the day Sanchez shot Aleasha and just after Sanchez learned of her infidelity. Sheehan's testimony therefore arguably supported Sanchez's contention that he was overcome that day by extreme emotional distress. Second, the note referenced a conversation that ostensibly occurred between Aleasha and Sanchez *eleven days* before her death. The note, therefore, greatly undermined Sanchez's contention that it was the stress of learning of her infidelity and being threatened with losing his children *on the day of her death* that led to the shooting. The note introduced a factor that no other evidence proved: that over a week prior to the shooting, he may have contemplated killing her if she was unfaithful to him. Because the jury did not hear other evidence that proved the same thing as the "tainted evidence," reversal on the basis of the "cumulative evidence" test is compelled under *Van Kirk*. *Van Kirk*, ¶ 45.

¶44     Finally, the Court errs in concluding that the note's admission had no impact on the outcome of Sanchez's trial. Opinion, ¶ 26. Given Sanchez's admission to the homicide, the trial had only two possible outcomes—a conviction of deliberate homicide or a conviction of the lesser charge of mitigated deliberate homicide. For the reasons outlined above, there is a

22

significant likelihood that the note convinced the jury that the homicide was not mitigated. *Van Kirk* dictates that there can be no reasonable possibility that the tainted evidence might have contributed to the defendant's conviction. *Van Kirk*, ¶ 44. That threshold cannot be met here. Therefore, I would reverse the District Court order denying Sanchez's petition for postconviction relief, grant the petition, and remand for a new trial, barring the introduction of Aleasha's note.


/S/ PATRICIA COTTER


Justice James C. Nelson joins the Dissent of Justice Patricia O. Cotter.

/S/ JAMES C. NELSON